Hello again. I'm the second two-timer here today. Jacqueline Beatty for Appellant American Guarantee. In their briefs, respondents argued that the District Court got it right the first time when it granted their motion for summary judgment back in 2008, and that American Guarantee's first appeal wherein this Court reversed the District Court for abuse of discretion, the party's subsequent motions for summary judgment trial, and now this appeal, are all unnecessary and a waste of time. But we are here today with 40 minutes of time, so I suspect the Court finds there's a little bit of interest in this. I wouldn't read anything into that. Let me just say on the question of time. One, nobody has to use all their time. And second, we tend to set the timing by the nature of the case. Insurance contract cases are generally set for 20 minutes. So just so everybody knows, we won't read anything one way or the other into that point. Fair enough. And maybe I won't take all of my 20 minutes in my opening remarks. I plan to start with the policy, the endorsement, talk about that endorsement, which is at page 755 in the record. I'll move from there and talk about a couple of rules of interpretation which the District Court failed to apply. Then I will discuss what the District Court did wrong and conclude with what American Guarantee wants this Court to do. Of course, if you have specific questions. Well, my question really goes to what the Court did wrong. I mean, it basically comes down to the Court saying that there was no contract for this additional insured, and so maybe you can point us to why that's wrong as a matter of contract legal interpretation. Certainly. The way the District Court framed the question, was there a contract? They didn't just say, was there a contract? At finding of fact number two, the Court said the parties proceeded to trial on the issue of whether a contract existed between Bellevue Master as an additional insured for the dismantling of the accident lift. Respondents have said, well, if we look at the endorsement itself, the endorsement has two requirements for there to be additional insured status. First, as required by contract. Second, executed before the loss. The endorsement doesn't say insurance has to be discussed. It doesn't say the insurance requirement has to be written, nor is there a requirement in the endorsement that says the insurance requirement has to be, quote, what the District Court said, added as an additional insured for the dismantling of the accident man lift. The connection between the work and the liability is in the second part of the endorsement. It's not in the first part. The first part simply says, as required by contract, provided it's executed for the loss. And the contract that's being referred to is the contract to insure. The second question, whether the additional insured's liability relates to the work being done at the time of the accident is in the second part of the endorsement, but isn't there in the first part where insured status is established. Can I ask you about the oral contract question? It doesn't say it has to be in writing, but is there an integration clause, or are there any other provisions of the contract in general that suggest that you couldn't either amend, add to, or play out these contract terms without it being in writing? There is no integration clause requirement in the policy. Under Washington law, contracts can take many forms. They can be oral. This particular language doesn't require that the contract to insure be in writing, therefore it can be oral. I'm not suggesting it's oral in this case, but when we get to the definition of executed, you certainly can't sign an oral contract. I was just trying to understand why you said that. So you're not saying there's an oral contract? No, but there's not a requirement that there be an integrated contract, such as a requirement, at least under the language of this policy. There certainly are other endorsements that get much more specific about what's required to form that contract for insurance. Are you conceding there was no oral contract between Bellevue and Northwest? Because I thought that one of the conditions of the certificate of insurance was that it be pursuant to contract. Are you conceding that? There must be an additional insured requirement pursuant to contract. Pursuant to contract. What was the contract? The contract in this case was the exchange of insurance requirements from Bellevue Master to Northwest Tower, and Northwest Tower's acceptance of those requirements and communication back to Bellevue Master. So it was a unilateral contract? It could be looked at as a unilateral contract. Is that the contract that there was? It could be interpreted as a unilateral contract. What was the performance of a provision of the original contract? Was it not as I understand it, Bellevue said after the work on the contract and said, by the way, we need a certificate of insurance. And at that point, Northwest provided it through its insurer. So that was, but there has to be an underlying contract to require the provision of the certificate of insurance, doesn't there? There needs to be an agreement to insure. Is that not a contract? You're running away from the word contract. Why is that? There has to be an agreement or a contract, a meeting of the minds between Northwest Tower and Bellevue Master in this case for Northwest Tower to name Bellevue Master as an additional insurer. Are you saying there doesn't have to be a construction contract, there has to be a contract for the provision of insurance? Yes, that is the contract that is contemplated. And here's why. Your position is that the insurance company didn't require there to be an underlying construction contract from which there should emanate a certificate of insurance? If that's what they wanted. If that's what the insurance company wanted, they could have all the insurance company included was as required by contract provided the contract is executed prior to the loss. If they were referring to an integrated contract, a single document that described the work and within it contained the insurance requirement. So your position is that as required by contract can refer to the unilateral contract formed by the demand by Bellevue that they get a certificate of insurance and Northwest compliance thereby? Well, it's more than just a certificate of insurance. A certificate of insurance, I agree, standing by itself doesn't necessarily mean insurance is in place. In fact, it actually says in those certificates that this is informational only. There's no rights emanating from the certificate, right? So where is the contract then? Supporting the certificate is the policy that defendants issued just as their predecessor issued, which contained this blanket additional insured endorsement. We had a communication from Bellevue Master to Northwest of what the project insurance requirements were. Bellevue, excuse me, Northwest then received those requirements, those requirements expressing the intent of Bellevue Master, transmitted those requirements to its broker. The broker then looked at the policies that were in place at the time to ensure that the additional insured requirement could be met. Then issued the certificate as evidence of that insurance, which Northwest Tower then expressed its mutual intent back to Bellevue Master by providing those certificates as evidence of insurance in place. Now what the trial court did was say basically what the trial court essentially has concluded. If we're not just talking about agreement to insure, but that the agreement to insure has to be negotiated each time a subcontractor returns to the project, each time the subcontractor performs something on the site, in this case Northwest Tower went out to Lincoln Square at least 44 times. Well, as a practical matter, parties like Northwest subcontractors cannot possibly negotiate insurance each time they go out to the site. They can have an oral contract for the job on a particular day. That's exactly what happened in this case as to the elevator dismantling. The Northwest refused to sign that subcontract. They refused to sign that purchase order, but at that time there was already in place an endorsement to Bellevue, not to Champion. Northwest already had in place at the time of the accident dismantlement an endorsement in its policy that said that provided additional insured coverage is required by contract. If you extend as required by contract out to mean not just the contract to insure, but the work being done at the time, then essentially you have a nonsense result. And the reason why you have a nonsense result is, number one, it doesn't reflect the realities of how these projects are run. At the beginning of the project, Northwest Tower actually had gone out and done some work, its first couple of tasks at the project. At that point Bellevue Master realized that Northwest Tower had not complied with the project's insurance requirements. Well, but the contract that must exist for there to be a certificate of insurance is the basis for the insurance company knowing that the person who is added as an additional insured has an insurable interest. If there's no contract there, the additional insured certificate would insure somebody who had no contractual basis, no insurable interest. The concept of insurable interest, with all due respect, isn't applicable here in the liability context. Insurable interest refers to if you have an ownership interest in property. But here, you know... Why would a certificate of insurance be given to Wombat Insurance Construction Company if they weren't working on the contract on Lincoln Square? Well... They'd have to be working on Lincoln Square in order for there to be a certificate of insurance issued. Northwest Tower was working on Lincoln Square. That's right. They began working there in February of January or so of 2001. They didn't get insurance in place, and by that I mean they didn't have a policy in place with an additional insured endorsement in it until they were reminded by Bellevue Master, in order to work on this project, you have to have certain insurance. And that insurance includes naming me, Bellevue Master, as an additional insured for your work at Lincoln Square. At that time, Northwest Tower then went to its broker, said, I need this insurance in order to work on Lincoln Square. Looks like I'm going to be working here for two or three years, which in fact is what occurred. The broker then issued the certificate evidencing Northwest Tower's intent to comply with the insurance requirement for it to work on Lincoln Square. It continued to maintain that insurance as evidenced by policy renewals throughout the entire time it worked on Lincoln Square, including the purchase and renewal of respondent's policies. It had consistently in place an endorsement in its policy that provided additional insured coverage to Bellevue Master. Is there anywhere in the record a written agreement whereby Northwest agreed that in order to provide work on the project, they'd have to have Bellevue named as an additional insured? There is no single writing, but I submit that the communication of the insurance requirements from Bellevue Master to Northwest, which was in writing, Northwest transmittal of those requirements to its broker, evidencing its intent to accept those requirements, the subsequent issuance of the certificate of insurance, and the endorsement behind it are sufficient writings to establish that there was a contract for insurance that applied to the project as a whole. But you've told us you're not relying on oral contract. I am not relying on oral contract to establish the contract to insure. The contract to insure is evidenced by the exchange of communications between the parties and the maintenance of the additional insured coverage by Northwest throughout the length of the project. I kind of feel like there's a lot of dots kind of out there, and you're trying to say if you connect all this constellation that you end up with enough to establish a contract. One of my questions and concerns really relates back to the certificate of insurance as to whether that can be evidence of anything given by its very terms. It's an exclusion of not actually, you know, if you have a piece of paper that says, look, this isn't, this isn't a contract, it's not an obligation, there's no legal rights flowing from this piece of paper. Can that piece of paper have legal significance in your constellation of facts? Yes, it can have legal significance. By itself it doesn't provide insurance, but it does, the creation and exchange and transmittal of this document in this case is written evidence of Northwest Tower's intent to provide the insurance for the project, for all of its work on the project throughout the lifetime of Lincoln Square. If I took out those certificates, in other words, I said, here's your group of documents that you're suggesting make up the contract, but I'm going to just take those out, would there be a contract then in your view? Yes, there would. What would the contract consist of? The contract would It's clear these requirements were in place for all subcontractors throughout the length of the project. That's what Mr. Bratton and others testified to. You have the communication of those requirements to Northwest Tower. Northwest Tower's communication of those requirements to its broker, who reviewed the policy in force at the time and then renewed a similar policy in the future which contained a blanket additional insured endorsement. And then the communication of that information back to Bellevue Master, who then permitted Northwest Tower to work on the project some 44 times or more each time Northwest Tower got paid. And there was testimony admitted at trial that had the insurance not been in place Northwest Tower would not have been paid. We have Northwest Tower's principal, Dave Weber, saying I had additional insured coverage for this project like I do for all of my projects and this insurance is in place throughout the life of the project. Do you want to save some remaining time for a rebuttal? Yes. Good morning. William Olson on behalf of Westchester Surplus Lines Insurance Company. I'd like to split the time we have with Co-Counsel Russell Love, so I'll be taking ten minutes this morning and allowing ten minutes for Mr. Love. I want to address this topic of these certificates of insurance and try and put it in a factual context, perhaps more clearly. In doing so, I'm kind of troubled by the fact that we're before you seemingly arguing facts without really specifying where the clear error is in the trial court's finding of facts. And I think that ought to be the appellant's burden here rather than making a trial court argument to you as to what their view of the facts is. But going to these certificates of insurance, these documents are dated in 2001. That's over a year prior to the need for any man lists on this project. Judge Peckman in finding of fact number 24 put those She said at that time there was an oral contract related to the tower cranes. That's finding of fact number 24, which the appellants have not challenged. An oral contract related to the tower cranes. It did not involve the man lists. There was no discussion or contract with reference to insurance or future work. That was her finding of facts number 25 through 27. She said that these certificates were requested and issued, but there's no evidence that the clerks that were involved had any knowledge of the terms of any existing contract. That's finding of fact number 27 that's not challenged. Did the district court find there was no contract relating to the dismantling work? No, the district court found, your honor, at finding of facts numbers 14 and 15 that there was an oral contract with Champion, between Champion and Northwest for the man lift work. And I think that's equally as compelling, more compelling point than talking about the certificates, because the contract for the man lifts was between Champion and Northwest, not between Northwest and Bellevue Master. And the additional insurance term was in a proposed written contract that Champion delivered to Northwest Tower that was rejected. When we were here on appeal one in this case, their lead argument was based on that Champion proposed subcontract. They lost on that and they've abandoned that argument and now they're resurrecting this one. Mr. Olson, my impression from reading the record was that there were two man lifts. One was included in the Champion contract and was rejected by Northwest. And then when Bellevue wanted Northwest to do the work, there was another man lift included. Northwest chased that job with Bellevue. So there was an oral contract between Bellevue and Northwest to fit or to disassemble the second man lift, which is where the accident occurred. Am I wrong on that? Yes, very respectfully, sir, you are. But I can understand the confusion. Early on in, I think it was, and you may have been reading testimony of David Weber. His testimony, he gave a quote to Bellevue Master to supply and install an Alamac man lift. That was in May of 2001. It ultimately developed that Bellevue Master chose to go with Champion for the man lifts. The two man lifts that were installed out there were Champion man lifts, not the Alamac man lift that Weber quoted to Bellevue Master. Bellevue Master directed Weber to deal with Champion and they selected the Champion equipment. So there were two hoists out there. We call them a Champion 7100 hoist. The 7100 refers to weight capacity. And then there was a Champion 2200, that smaller hoist. It's called a single hoist. The bigger one is called a dual hoist. The accident man lift was the single hoist. So when they talk about the hoist on the hotel, is that kind of number one? I can't remember which was on the hotel and which was on the other. I'm referring to Jeff Peckman's findings. We had a single hoist and a dual hoist. The single hoist is the accident man lift. Bellevue Master leased both pieces of equipment from Champion and Champion subcontracted the installation of both pieces of equipment to Northwest. But Your Honor, going back to your question, and it ties into counsel's arguments about Bellevue Master's requirements and all these additional insured requirements and so forth. Because they elected not to contract with Northwest Tower, their requirements were never implemented. There's an additional insured requirement in the lease between Bellevue Master and Champion. It's written in the lease, but it's the reverse. It's Bellevue Master that has the obligation to provide additional insured coverage to Champion. Is there any doubt that Bellevue wanted to be named as an additional insured of insurance for entities like your client? Well, I suspect that would have been their preference. Their preference was to contract with Champion directly rather than to work with Northwest Tower. But there's no doubt that Northwest knew Bellevue wanted this insurance being named as an additional insured? I have to say there is considerable doubt. Why did their employee ask for that? Their employee asked for it because it was part of her task to get that trying to find proof of insurance and those types of things. It's part of her administrative duties. But when you ask me, is there any doubt that Bellevue Master wanted it? I read that question as, is there any doubt that the men with contracting authority wanted it and talked about it and discussed it? And here, all the men with contracting authority that talked about it discussed it. There was no contract at all about it. Their three heroes at trial were Jerry Osmond, and he says, I never contracted with Northwest Tower for any insurance. They go to Tony Mantle. Tony Mantle says, you know, contracting really wasn't my bailiwick. I'm just a scheduling guy. I didn't contract with Northwest Tower. They bring on Dick Bratton, and he testifies, I have no knowledge of any Northwest Tower contracts. What did Northwest think when they got this insurance certificate? I can tell you what Dave Weber thought about it. He didn't know it existed. He had no involvement in its preparation. He didn't request it be prepared. He didn't know it was prepared. He didn't learn of it until he had an accident. Tell me if my chain here is incorrect. It's undisputed that Bellevue wanted to require people doing work on this project that they be named as an additional insured. Is that right? I believe that Bellevue Master had a requirement for obtaining additional insured coverage that did not apply across the board. For example, it didn't apply to equipment. But Bellevue wanted entities that came on the project to provide them with this coverage. With some exceptions, Champion being the one I just explained. And there's no doubt that Northwest knew that this was a requirement of doing work on the job, right? Then why did they ask for the certificate? Sue Yancy, an office employee at Bellevue Master, asked for the certificate. It comes to a Northwest Tower office handled by a clerk there, transmitted off to a clerk in an insurance broker office in Portland. These people are performing their administrative duties. Sure sounds like custom and practice. And that's what happens. It is custom and practice to get these additional insureds. They're basically in the underbrush doing all this because that's how it's done. Why isn't that some evidence that there is, that this is part of an evidence to contract? If you read the Stonehenge case that I cited in the brief, the facts are strikingly similar. You had a contract and then two months after the contract, you had the certificates of insurance issued. Just watch your time. You're past your ten minutes, just so you know. Can I just finish this one thought? In the Stonehenge case, I think it's remarkably similar on the facts. You had a contract there, a written contract. In contrast to here, we had an oral contract for the tower cranes. And then two months later, you have the certificates of insurance that are issued. The same in Stonehenge as here. We had the tower cranes up and after contract performance. And the court in Stonehenge says, well, the argument here is this is evidence of intent. But these are issued, and I'm kind of somewhat paraphrasing Stonehenge, but the district judge there, and it is a district court case, said, you know, these are issued two months after contracting and do not inform an analysis as to what the parties were thinking. May I ask you this? The Stonehenge case I see here is an unpublished opinion. Does that mean we can't cite it? It's Stonehenge. I have Stonehenge security. It must be a different one. It's Stonehenge, and it is a published opinion. It's a district court opinion, Your Honor, and it is published. Thank you. Good morning, Your Honors. My name is Russell Love on behalf of Royal. Royal is the excess insurer for Northwest Tower. The fact issue at trial, Your Honors, was was there a contract requiring additional insured coverage for Bellevue Master? And the short answer to that question is simply no, and that is supported by the record, and there are no challenges to the findings of fact on which that finding is based. So the whole line of argument that you have seen in the appellant's brief is simply addressing issues that are irrelevant. The whole policy interpretation, alleged misinterpretation issue is simply irrelevant. The question of whether Judge talking about formal execution as opposed to execution, that's irrelevant to the issue. The ongoing operations issue is irrelevant. The issue that Judge Pequin was deciding was, was there a contract for this? And the answer was no, and there is simply no challenge to the findings of fact on which that's based. Now what their argument is, is it is simply there was, despite all of that, and despite the fact that their burden here is to establish, according to them, they have to establish that they are entitled to a judgment as a matter of law. That is their position here, as stated in their brief. So they have to establish that all of the arguments were clearly erroneous, and they haven't even begun to, they haven't even alleged that that's true. But what their argument here is, is really based on, their whole argument for the contract is based on two documents. One is the, the Sue, what I refer to as the Sue Yancy letter, the letter sent by, in February of 2001, which they would characterize essentially as an offer. And then the certificate of insurance that was, that was sent back, which they would characterize as, as an acceptance. Now, they are simply wrong about, about all of that on, on multiple levels. But first of all, with respect to the, to the letter, the Sue Yancy letter, there is no reference in the, in the letter itself, in the body of the letter itself, to additional insured coverage under the CGL. Was she acting without authority? I, I don't know what, whether she was prompting, listen, what prompted her to make this request? No, because there was no evidence at all. Sue Yancy did not testify. They simply, they, they simply were putting this, this piece of paper in front of the court and saying this is, this is the offer, offer. Do we know why Sue Yancy made the request? No. There's no evidence about that. Or who directed her to do it? No. Or what happened with the certificate she got? When it came to her? Pardon me? When it, when the certificate came to her? No, there's no, there's no evidence at all about that. And she sent it on to Bellevue, did she not? We can, we can only assume. I mean, I, there, there simply was, since she didn't testify, nobody, nobody, as far as I can recall, the record simply doesn't reflect. Are you telling us that there's no evidence that the certificate was obtained by Northwest and then sent by Northwest to Bellevue? No, I'm not, I'm not saying that. I'm saying that, I'm saying that, that the, that what, what is contained in the Sue Yancy letter does not amount to an offer or an offer that can be accepted because there. Is there any reference to additional insured in that letter? There, there, in the letter itself, there are references to, as I recall it, to you need to provide employer's liability coverage and you need to provide some, some other coverage. And then, but, but there is nothing about, in, in the body of the letter, there is nothing about, about CGL coverage. Then they attached to the. I don't think you're, you're quite accurate. I have the letter here in front of me and it says, a recent review of the insurance documents provided by your company has been done. Your, your insurance, Northwest insurance, needs to be revised as follows. One, add employer's liability coverage. Right. Employer's liability coverage. Correct. In the amounts listed in the attached information sheet and in number two, endorsements must identify Bellevue Masters as certificate holder. Three, Bellevue Master and PCL Construction Services Inc. must be identified in endorsement to certificate of insurance. Okay. Number one, we're not talking about employer's liability coverage here. We're talking about CGL.  So, and that's exactly my point, Your Honor. Do you think paragraphs two and three relate solely to the employer's liability? Yes. And that's certainly, I mean, if they're saying that this is the, this is the offer, then they have to, they have to establish that it's unambiguous. And clearly, you know, there is nothing in that letter that talks about CGL coverage and that says you must provide, you must make us an additional insured on your CGL coverage. Now, the only thing that they point to is the attachment, one of the attachments to the letter that had a sample additional insured endorsement, but, and from a CGL policy. But the body of the letter itself does not require CGL. Yeah, they say the endorsement modifies insurance provided under the following, commercial general liability part, schedule. Correct. That's CGL. Correct. I mean, that's the attachment. But my point is that the body of the, that's just an example. The body of the letter itself does not ask for CGL, additional insured coverage for CGL. There is no reference in the letter to what, to contract terms, what other contract terms are involved. There is no reference in the letter to what are the limits, additional insured limits that are required. There's nothing about, you know, what is the subject matter exactly of this contract? What does this refer to? Does it refer to the tower cranes that Northwest had erected previously? And moreover, this is a letter that is being sent at a time when PCL was the general contractor on the project. And now, and you will recall that there were two shifts of general contractor on the project. At the time of the accident that we are talking about here, BOVIS was the general contractor on the project. I want to wrap up. So the point here is how do any requirements potentially of contracts that were entered into with PCL have to do with during the BOVIS period of operation? They don't. Thank you. Thank you. The court has correctly noted that the transmittal of the project insurance requirements did include general liability, as is common practice in these types of projects. If we need to show insurance negotiated each time a subcontractor returns to the project to do work, then we have a completely untenable situation that doesn't happen in real life. Here, the insurance was obtained after the initial tower crane work. If an accident had happened during that tower crane work, there wouldn't be coverage, because the agreement to insure occurred after the original tower crane work. But once the insurance was in place, it was the intent of the parties to continue it, as evidenced by the renewal, the continuation of Bellevue Masters' agreement to allow Northwest Services to perform work at the site and paying it. With their blanket additional insured endorsement. Go back to the issue that counsel was raising. What is the error of fact that Judge Peckman made? It was an error of law in interpreting the insurance policy to require that an insurance term had to be specifically negotiated as part of the accident man lift work. By concluding that, by making that ruling of law, interpreting the policy in that way, it caused the court to make certain findings that were not particularly relevant, and the court did not make other findings. I know my time is up. I believe the court is aware that Judge Peckman completely reversed herself in her analysis. This Ohio casualty? Yes. Right. She got it right that time. All right. Thank you. Thank counsel for your argument this morning. The case just argued. Evanson v. Westchester is submitted.
judges: Hawkins, McKeown, Bea, Cjj